

Keith M. Lundin
U.S. Bankruptcy Judge
Dated: 06/15/09



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

In re: **1POINT SOLUTIONS, LLC,**
**BARRY R. STOKES,**

**Debtors.**

Case No. 06-5400
Case No. 06-5898
Administratively consolidated
under 06-5400

Chapter 11

Hon. Keith M. Lundin

**JOHN C. MCLEMORE, Chapter 11 Trustee,**

**Plaintiff,**

**v.**

**GREENPEACE, INC. 401(k) SAVINGS PLAN,**

**and**

**CROSSLIN SUPPLY CO., INC., PROFIT
SHARING/SAVINGS PLAN,**

**Defendants.**

Adv. No. 08-365

Adv. No. 08-366

## MEMORANDUM OPINION

A central policy of the Bankruptcy Code—"equality of distribution among creditors"[1]—here

collides with the statutory trust erected by the Employee Insurance Retirement Income Security Act

---

[1]    *See, e.g., Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S. Ct. 527, 116 L. Ed. 2d 514 (1991)
("'prime bankruptcy policy of equality of distribution among creditors of the debtor'") (quoting H.R.
Rep. No 95-595, at 177-78 (1977)); *Nathanson v. NLRB*, 344 U.S. 25, 29, 73 S. Ct. 80, 97 L. Ed. 2d
23 (1952) (noting same policy of "equality of distribution" under the Bankruptcy Act).

of 1974 ("ERISA").[2]  Bankruptcy policy fares poorly because of the powerful limitation on a

trustee's avoiding powers identified by the Supreme Court in *Begier v. IRS*.[3]

The issue on cross motions for summary judgment is whether the Chapter 11 trustee can

recover as fraudulent conveyances under 11 U.S.C. § 548(a) and/or TENN. CODE ANN.

§ 66-3-305(a)(1) "phantom profits" paid by debtor, 1 Point Solutions, LLC, to Defendants from

funds impressed with a statutory trust before receipt by the debtor.  Under *Begier,* 1Point paid the

Defendants with trust funds that were not property of the debtor for purposes of § 548(a), § 544(a)

and § 66-3-305(a)(1).  These transfers are not avoidable in this adversary proceeding[4] and defendants

are entitled to summary judgment.  The following constitute findings of facts and conclusions of law.

FED. R. BANKR. P. 7052.

## FACTS

Plaintiff is the Chapter 11 trustee for 1 Point Solutions, LLC ("1Point") and Barry Stokes.

1Point was a "third-party administrator"[5] of various types of benefit plans, including 401(k)

---

[2]    29 U.S.C. §§ 1001-1461.

[3]    496 U.S. 53, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990).

[4]    As explained below, infirmities in the trustee's position in this adversary proceeding are to
a substantial degree peculiar to the bankruptcy context and may not infect recovery rights of the
trustee or similarly situated parties in other litigation contexts.

[5]    Defendants describe 1Point as having provided investment, recordkeeping and other
administrative services.  Whether a "third-party administrator" is a fiduciary under ERISA is a
factual matter, much discussed in the courts.  *See, e.g.*, *Pipefitters Local 636 Ins. Fund v. Blue Cross
& Blue Shield of Mich.*, 213 Fed. Appx. 473 (6th Cir. 2007) (third-party administrator of
multiemployer plan may have "acted as a fiduciary in assessing and failing to disclose fees"); *Briscoe
v. Fine*, 444 F.3d 478 (6th Cir. 2006) (third-party administrator over medical plan was fiduciary
because it exercised sufficient control over plan assets to pay itself an administrative fee from the
plan's account upon termination of the plan); *Oliver v. Coca-Cola Co.*, 397 F. Supp. 2d 1318 (N.D.

2

retirement plans, flexible spending accounts ("FSA"), health savings accounts ("HSA"), health reimbursement accounts ("HRA") and dependant care accounts ("DCA").[6] Many of these plans were governed by ERISA. By 2006, 1Point administered benefit plans for roughly 35,000 employee/participants from over 800 entities. Among these were 401(k) retirement plans relating to over 1,000 employees of approximately 55 entities. Barry Stokes was the sole owner and chief operating officer of 1Point.

1Point entered into a brokerage agreement with Mid-Atlantic Capital Corporation ("MACC") in 2001. MACC is a registered broker-dealer. An account was set up in the name of 1Point 401(k) with MACC. Separate accounts for individual benefit plans were not established. 1Point clients were instructed to make plan deposits to MACC. They did so to the tune of many millions of dollars through 2005. 1Point also maintained accounts at Regions Bank[7] into which Cafeteria Plan funds were deposited along with other cash.

---

Ala. 2005) (claims administrator was an ERISA fiduciary where it was cloaked with authority to make decisions, even though plan sponsor purported to reserve "final" decision-making authority under the plan).

    Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary aurthority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). The District Court for the Middle District of Tennessee in other litigation has observed that 1Point and Stokes "appear[ed] to have been . . . fiduciar[ies] under ERISA". *Heritage Equity Group Sav. Plan v. Mid Atlantic Capital Corp.*, No. 3:07-0841 (M.D. Tenn. Aug. 28, 2008) (Memorandum on defendants' motion to dismiss under Rule 12(b)(6), at 24); *McLemore v. Regions Bank*, No. 3:08-cv-0021 (M.D. Tenn. 2008) (Memorandum on defendants' motions to dismiss, at 33). The District Court also concluded that the Chapter 11 trustee is an ERISA fiduciary. *McLemore v. Regions Bank*, No. 3:08-cv-0021 (M.D. Tenn. 2008) (Memorandum on defendants' motions to dismiss, at 10-15).

[6]    The FSA, HSA, HRA and DCA accounts are so-called "Cafeteria Plans."

[7]    Formerly AmSouth Bank.

1Point was operated by Stokes as a Ponzi scheme.[8]  Client plan monies were embezzled by

Stokes.  Money from any one plan was indiscriminately used to repay participant claims under other

plans and to cash out plans terminating their engagement with 1Point.  The plan funds entrusted to

1Point were not invested.  Instead, plan assets were commingled in accounts from which Stokes

disbursed money according to his personal needs and desires, including payment of business

expenses of 1Point.

False statements were regularly prepared by 1Point and distributed to plan participants

representing that plan assets were invested.  "[S]ophisticated 401(k) administration software"[9] was

used to apply daily rates of mutual fund performance to contribution and investment data of each

participant, allowing 1Point to provide participants with regular (fake) performance reports.  These

reports reflected what might have been the earnings of plan participants had funds been invested.

When the 1Point/Stokes fraud collapsed in 2006, over $14.5 million in plan assets had been

embezzled, misappropriated and converted by 1Point/Stokes.

---

[8]  Stokes's indictment and conviction are discussed below.  "The term 'ponzi scheme' is derived from Charles Ponzi, a famous Boston Swindler[, who, with] capital of $150 . . . began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days.  Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due."  *United States v. Masten*, 170 F.3d 790, 797 n.9 (7th Cir. 1999) (quotations and citations omitted).  *See also Cunningham v. Brown*, 265 U.S. 1, 44 S. Ct. 424, 68 L. Ed. 873 (1924).  "Generically, a Ponzi scheme is a phony investment plan in which monies paid by the later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."  *In re Bonham*, 229 F.3d 750, 759 n.1 (9th Cir. 2000).

[9]  Trustee's Statement of Material Facts & Docs., Ex. 1 at 16 (hereinafter, "Stokes Plea Agreement").

4

1Point was third-party administrator for defendants Crosslin Supply Co., Inc., Profit Sharing/Savings Plan ("Crosslin Plan") and Greenpeace, Inc. 401(k) Savings Plan ("Greenpeace Plan") (collectively, the "Plans").

The Crosslin Plan is an ERISA qualified 401(k) defined contribution plan. The Crosslin Plan is funded by employee payroll deductions, participant rollover contributions, and by employer matching contributions.

Crosslin engaged 1Point as third-party administrator for the Crosslin Plan effective December 31, 2002. In that role, 1Point was to (1) provide an array of mutual funds that could be offered as investments under the Crosslin Plan; (2) implement participants' investment directions on a daily basis; (3) perform administrative services including enrollment, tracking contributions, distributions, loans and rollovers and providing quarterly account statements to participants.[10]

Between December 31, 2002, and January 15, 2003, Crosslin Plan assets of $1,579,308.88 were transferred to 1Point accounts. Contributions of participant payroll deductions and of Crosslin matching contributions were forwarded to 1Point through December 31, 2004.

Crosslin Plan terminated its engagement of 1Point effective December 31, 2004, and appointed Hartford Life Insurance Company as successor third-party administrator. On May 31, 2005 and June 2, 2005, at Crosslin's direction, funds totaling $2,241,695.62 and $56,042.39 were transferred to Hartford from 1Point on behalf of the Crosslin Plan. These amounts included the "principle" deposited by Crosslin Plan with 1Point, plus accumulated (nonexistent) "earnings" as reported to Crosslin Plan participants by 1Point.

---

[10] The parties do not dispute this statement of the relationship but no written agreement between Crosslin Plan and 1Point was offered on summary judgment.

5

Greenpeace, Inc. established the Greenpeace U.S.A. Savings Plan in 1997 to provide retirement benefits to its employees. The Greenpeace Plan is an ERISA qualified defined contribution plan. From February 2003 through May 31, 2005, 1Point provided third-party administrative services to the Greenpeace Plan.[11] In 2005, Greenpeace terminated 1Point, and engaged Fidelity Investments as successor third-party administrator. On May 31, 2005, 1Point transferred $1,648,702.07 to Fidelity at the request of Greenpeace Plan. This amount included contributions forwarded by Greenpeace Plan to 1Point plus accrued "earnings" reported by 1Point in its (fake) quarterly reports.

During the years in which 1Point acted as third-party administrator, plan assets of both Crosslin Plan and Greenpeace Plan were commingled with the assets of other ERISA plans. Cafeteria Plan money also moved among 1Point accounts, was commingled and misappropriated.

Just prior to the cashing-out of the Crosslin and Greenpeace Plans, on May 23 and 24, 2005, Beck-Arnley 401(k) Plan,[12] another of 1Point's clients, transferred to 1Point's account at MACC $6,080,363.24 in Beck-Arnley Plan assets.[13] On the day the Beck-Arnley Plan assets were received, the balance in 1Point's MACC account was $6,199.71. The Beck-Arnley Plan assets were immediately used to cover the withdrawals demanded by Crosslin Plan and Greenpeace Plan. As explained in Stokes's plea agreement:

> Two of the transactions dissipating Beck/Arnley funds occurred on May 31, 2005. On this date, [Stokes] sent an email to Mid-Atlantic Capital Group instructing Mid-

---

[11] No written contract between Greenpeace Plan and 1Point has been offered in this proceeding.

[12] Now known as Heritage Equity Group 401(k) Savings Plan.

[13] Stokes's plea agreement represents this amount to be $6,079,677.46. The difference is not material.

6

Atlantic to transfer $1,648,702.07 from the 1Point Solutions account to an account . . . for the benefit of Greenpeace, Inc., as the Greenpeace 401(k) plan had been embezzled and its ERISA funds entirely dissipated by the defendant [Stokes] prior to May 2005.

On May 31, 2005, the defendant [Stokes] also sent an email to Mid-Atlantic Capital Group instructing Mid-Atlantic to transfer $2,241,695.62 . . . for the benefit of Crosslin Supply, another company whose entire 401(k) plan had been embezzled by the defendant prior to May 2005. In the months leading up to these transfers, both Greenpeace and Crosslin had been demanding the return of their ERISA plan funds. However despite such demands and the threat of legal action, the defendant had been unable to comply because he had embezzled and spent the entirety of both plan's [sic] funds.

(Stokes Plea Agreement at 25.)

Since no[14] investments were made with Plan funds, the "profits" and "earnings" paid to the Crosslin and Greenpeace Plans were "phantom income" reported by 1Point to perpetuate the fraudulent scheme.

An involuntary bankruptcy petition was filed against 1Point on September 26, 2006. Orders for relief were entered against 1Point and Stokes personally on September 27, 2006. The Chapter 11 cases have been administratively consolidated. John McLemore was appointed Chapter 11 trustee in both cases.

Stokes was charged with 29 counts of embezzlement of ERISA funds, 21 counts of mail fraud, 11 counts of wire fraud, 11 counts of money laundering and four counts of criminal contempt. On September 9, 2008, Stokes entered into a guilty plea agreement.

---

[14]   The review of accounts shows investments in the amount of $534.32 made on behalf of Greenpeace Plan participants.

The 1Point/Stokes Ponzi scheme has spawned much litigation in this court and in the U.S. District Court for the Middle District of Tennessee.[15] Plaintiff commenced this action to avoid transfers of "phantom profits" to the Defendant Plans under 11 U.S.C. § 548(a) and under TENN. CODE ANN. § 66-3-305(a), Tennessee's fraudulent conveyance statute.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989). The court is not to "'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 252).

---

[15] Parallel to this proceeding is an action by Heritage Equity Group 401(k) Savings Plan (formerly Beck-Arnley 401(k) Plan) in the district court against Crosslin Plan and Greenpeace Plan to recover the funds each received upon termination of 1Point as third-party administrator. Heritage seeks recovery of all funds, including the phantom profits sought by the Chapter 11 trustee in this proceeding. The Defendant Plans have expressed concern that they could be held liable for two recoveries on the same claims, one to the Chapter 11 trustee and one to Heritage. That issue is not presently before this court.

8

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. at 325. The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250-52. All inferences are drawn in the light most favorable to the nonmoving party. *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 442 (6th Cir. 2003) (citations omitted). The party opposing a motion for summary judgment, however, "'may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *In re Tri-City Turf Club, Inc.*, 323 F.3d at 442- 43 (internal citations and quotations omitted). *See also Liberty Lobby, Inc.*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate.'" *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998)).

When cross-motions for summary judgment have been filed, the court must evaluate each motion on its own merits, viewing all facts and inferences in the light most favorable to the non-moving party. *See Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004).

## II. Fraudulent Conveyance Actions under 11 U.S.C. § 548

The Chapter 11 trustee seeks to avoid as fraudulent transfers under 11 U.S.C. § 548(a)(1) "phantom profits" of $561,844.51 paid to the Crosslin Plan and $268,860.64 paid to the Greenpeace Plan. Section 548(a) provides in pertinent part:

> (a) The trustee may avoid any transfer of an interest of the debtor in property, . . . , that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> > (1) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date of such transfer was made . . . .11 U.S.C. § 548(a)(1).

The trustee asserts that the plea agreement and other undisputed facts establish a complete right to recovery under § 548(a).

Crosslin Plan and Greenpeace Plan respond that the predicate for recovery under § 548(a)—a transfer of *property of the debtor*—is lacking for two reasons: 1) the trustee is estopped to assert that the payments to Crosslin and Greenpeace Plans were transfers of property of the debtor because the trustee has taken the inconsistent position in other litigation in District Court that deposits with 1Point by benefit plans were held in trust and that 1Point/Stokes were ERISA fiduciaries with respect to the Plans;[16] and 2) the assets delivered to 1Point/Stokes by the various benefit plans were impressed with a statutory trust before delivery and never became property of either 1Point or Stokes. That funds returned to the Defendants were not the particular funds these Plans deposited with 1Point/Stokes is irrelevant, say the Plans—all funds were held in trust.

The trustee replies that the funds used to cash-out the Defendants were deposited by the Beck-Arnley Plan and "[n]one of that money can be identified to any fund held for the benefit of the

---

[16] For reasons explained below, it is unnecessary to address this estoppel argument or to express any opinion about the positions taken by the parties in other litigation.

[Plans]." The actual funds contributed by the Defendants were commingled and stolen, and therefore retained no trust attributes at the time of the transfers the trustee seeks to avoid.

These adversary proceedings frame a tension between the Bankruptcy Code and ERISA.[17] A central purpose of ERISA is to "offer employees enhanced protection for their benefits." *Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996); 29 U.S.C. § 1001(b) (ERISA was enacted "to protect . . . the interests of participants in employee benefit plans and their beneficiaries"). Pension plans and the employees they serve often become creditors in bankruptcy cases—competing with other creditors for limited assets. Here, the trustee's obligation to collect avoidable prepetition transfers and then redistribute those transfers fairly among similarly situated claimants collides with ERISA policy.

For the trustee to exercise the avoidance power in § 548(a), there must have been a "transfer of an interest of the debtor in property." The Bankruptcy Code does not define "property of the debtor." In *Begier*, the Supreme Court defined "property of the debtor" by reference to "property of the estate" in the context of an avoidance action defended on the basis of a statutory trust:

> Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors—'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. For guidance, . . ., we must turn to § 541, which delineates the scope of 'property of the

---

[17]    In cases of direct conflict between ERISA and most other federal laws, ERISA yields. "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). *See, e.g.*, *Pulaski Highway Express, Inc. v. Central States Southeast & Southwest Areas Health & Welfare & Pension Funds (In re Pulaski Highway Express, Inc.)*, 41 B.R. 305 (Bankr. M.D. Tenn. 1984). Without engaging in word games, *Begier* provides a clear path through the tension in these adversary proceedings.

11

estate' and serves as the postpetition analog to § 547(b)'s [or § 548(a)'s] "property of the debtor."

*Begier*, 496 U.S. at 58-9.

The *Begier* Court continued:

Section 541(a)(1) provides that the "property of the estate" includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.' Section 541(d) provides:

"Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a) only to the extent of the debtor's legal title to such property, but not tot the extent of any equitable interest in such property that the debtor does not hold."

Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not "property of the estate."

*Begier*, 496 U.S. at 59.

*Begier* is of particular relevance here because it addressed the treatment of a statutory trust in the context of a bankruptcy avoidance action.[18]  In *Begier*, the issue was whether money transferred from the debtor's operating account to the IRS in payment of taxes was recoverable from

---

[18]  After oral argument, the parties were invited to further brief *Begier*.

In supplemental briefing, the trustee urged that the Plans could not establish the "nexus" required by *Begier* with respect to the funds they received as "phantom profits."  The Plans' funds had been commingled and stolen, they no longer existed.  The monies transferred to the Plans were other parties' stolen money, namely Beck-Arnley Plan's funds.  The trustee urged a narrow reading of *Begier*, citing *In re Kulzer Roofing, Inc.*, 139 B.R. 132 (Bankr. E.D. Pa. 1992), a nonstatutory trust case.

The Defendant Plans asserted that *Begier* does not apply because there was no commingling of trust assets with assets of the Debtors.  Here, trust funds were commingled with other trust funds, not in a general operating account.  Alternatively, the Plans argued that if *Begier* applies, the nexus is the voluntary payment of funds from 1Point's MACC account to the Defendants' successor administrators.

12

the IRS as a preference under 11 U.S.C. § 547. The taxes in *Begier* were employee payroll withholdings and excise taxes that qualified as "trust fund taxes" for purposes of 26 U.S.C. § 7501.[19]

The IRS defended the preference action on the ground that trust fund taxes were not property of the debtor. The *Begier* trustee argued that no trust arose with respect to taxes paid to the IRS because the taxes withheld and collected were commingled in the debtor's general operating account and the specific money withheld or collected could not be traced into the coffers of the IRS.

The Supreme Court held that the funds transferred to the IRS were held in trust and were not property of the debtor. *Begier*, 496 U.S. at 66-7. Starting with the language of IRC §§ 7501, 4291 and 3402(a)(1), the Court observed that "the act of 'collecting'" and the act of "withholding" occurred before remittance to the government—at the time of payment of an excise tax and at the time withholding taxes are deducted from an employee's wages. Reading § 7501 to create a trust in the hands of the collector/withholder at the moment of collection/withholding placed creation of the trust beyond the whim of the debtor. To hold otherwise would allow an employer to avoid the creation of the trust by merely failing to segregate funds—defeating the protection of the public fisc Congress sought to provide via the statutory trust. *Begier*, 496 U.S. at 65-6. *See also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 98 (3d Cir. 1998).

Having found the existence of a trust for the benefit of the IRS in "the amount" of tax collected or withheld, the Supreme Court next considered "whether the particular dollars that

---

[19]     Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States.

26 U.S.C. § 7501.

[debtor] paid to the IRS from its general operating accounts were 'property of the debtor.'" *Begier*, 496 U.S. at 62. The Court rejected common law trust rules:

> Under common-law principles, a trust is created *in property*; a trust therefore does not come into existence until the settlor identifies an ascertainable interest in property to be the trust res. A § 7501 trust is radically different from the common-law paradigm, however. That provision states that "the *amount* of [trust-fund] tax . . . collected or withheld shall be held to be a special fund in trust for the United States." Unlike a common-law trust, in which the settlor sets aside particular *property* as the trust res, § 7501 creates a trust in an abstract "amount"—a dollar *figure* not tied to any particular assets—rather than in the actual dollars withheld. Common-law tracing rules, designed for a system in which particular property is identified as the trust res, are thus unhelpful in this special context.

*Begier*, 496 U.S. at 62-3 (emphasis in original).

From the legislative history and floor statements accompanying the 1978 bankruptcy amendments, the Supreme Court deduced that Congress contemplated "the IRS would have to show *some* connection between the § 7501 trust and the assets sought to be applied to a debtor's trust-fund tax obligations." *Begier*, 496 U.S. at 65-6 (emphasis in original). The requisite "nexus" could be found in the payment of withholding taxes which would be "'a payment of money held in trust under . . . § 7501(a) . . . 'the beneficiary of the trust, . . . , is in a separate class with respect to those taxes, if they have been properly held for payment, as they will have been if the debtor is able to make the payments.'" *Begier*, 496 U.S. at 66 (quoting H.R. Rep. 95-595, at 373 (1978)). Reading literally the language in the House Report, the Court concluded that "the bankruptcy trustee could not avoid *any* voluntary prepetition payment of trust-fund taxes regardless of the source of the funds. . . . The debtor's act of voluntarily paying its trust-fund tax obligation therefore is alone

14

sufficient to establish the required nexus between the 'amount' held in trust and the funds paid."

*Begier*, 496 U.S. at 66-7.[20]

---

[20] In a case preceding *Begier* by over a decade, the Sixth Circuit reached a similar conclusion in *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir. 1979). In *Selby*, the Sixth Circuit addressed the affect of a statutory trust, the Michigan Builders Trust Fund Act, on preference actions under the Bankruptcy Act. The "Michigan Act creat[ed] a security device in the form of a 'trust fund' for the benefit of the owner and subcontractors on construction projects[.]" *Id.* at 643. "The purpose of the statute [was] to protect the owner and those whose labor and materials ma[de] the performance of a construction contract possible and [gave] rise to the owner's obligation to pay." *Id*. at 644. The court concluded that the trustee of a bankrupt general contractor could not recover preferential payments to subcontractors because "a Michigan building contractor does not have sufficient beneficial interest in funds impressed with the statutory trust to constitute his 'property' under the Bankruptcy Act." *Id.* Much like the Supreme Court in *Begier*, the Sixth Circuit in *Selby* drew upon "the language and purpose of the Bankruptcy Act in relationship to property rights created under state law, the practices of the construction industry and the problems of the industry which the statutory trust was designed to remedy." *Id.* at 645.

Although decided under the Bankruptcy Act, the Sixth Circuit found its conclusion consistent with the then new Bankruptcy Code. Citing § 541, the Senate Report and statements of floor managers, the court concluded the "legislative purpose is clear. Statutory trust funds are not the property of the debtor and are not subject to the statutory lien . . . and prefe[r]ence . . . provisions of the new Act." *Id.* at 649 & n.17.

The *Selby* court did not reach the tracing issue, saying only that it presented no problem because "[t]he funds subject to the statutory trust were paid to the subcontractor as trust beneficiaries prior to bankruptcy." *Id.* at 649. The court also left for another day the question of "what power the trustee has to recover payments made to favored subcontractors when the building trust funds have been exhausted and some subcontractors have been left unpaid." *Id.* at 649 n.19.

15

While some courts have struggled to confine *Begier* to its facts,[21] other courts have recognized its relevance to other instances of statutory trusts.[22]

---

[21]   *See, e.g.*, *Morin v. Frontier Busi. Techs.*, 288 B.R. 663 (W.D.N.Y. 2003) (Funds received by debtor/payroll service provider and paid to IRS on behalf of defendant were not impressed with IRC statutory trust. Citing *Begier*, the court explained "[i]f the employer physically sets aside a $10 bill as the withheld tax, and that $10 bill is destroyed in a fire, the trust is not destroyed along with it; it remains at all times with the employer, until the required tax is finally paid. Thus, even if [debtor] *should* have segregated the funds it received from [defendant], the fact that it did not means that the § 7501 trust did not 'follow' the dissipated funds, but remained with [defendant-employer], the taxpayer, which remained obligated to hold the amount of withheld funds in trust for the United States."); *United States v. Natale (In re TCB Carpet Servs., Inc.)*, No. 00 C 50202, 2000 WL 1576322, at *3 (N.D. Ill. Oct. 10, 2000) (While stating that Begier is "not necessarily limited to its facts", court rejects IRS's attempt to effect nexus via involuntary payment. "If the IRS could establish a connection with the trust fund taxes simply by levying a debtor's property and forcing an involuntary seizure of funds, it would render the nexus requirement meaningless. Given the breadth of the IRS's levying power under 26 U.S.C. § 6331, the IRS could choose to levy any of the debtor's property it likes . . . and still satisfy the nexus requirement even if the property really has no connection whatsoever with the debtor's trust fund taxes, so long as it levied the property for the purpose of satisfying the debtor's trust fund tax obligations. . . . [S]imply levying [debtor's] bank account, which happened to have funds in it on the day of the levy, is not enough to carry the day for the United States."); *In re Alamance Knit Fabrics, Inc.,* 251 B.R. 293 (M.D.N.C. 1999) (Noting that "[a] number of courts have used the uncertainty of *Begier* as an opportunity to severely limit the impact of its holding . . . [and concluding that even under *Begier*] claimants to express [statutory] trust funds must somehow identify the current location of the res. . . . [R]es identification is best accomplished by submitting evidence which enable the court to trace misappropriated funds." Unremitted employee contributions to ERISA health plan as well as unremitted employer matching contributions had to be traced to actual funds held by debtor at the petition date.); *United States v. Borock (In re Ruggeri Elec. Contracting, Inc.)*, 214 B..R. 481, 488 & n. 3 (E.D. Mich 1997) (Noting almost universal narrow interpretation of *Begier* among the bankruptcy courts, court refused to extend *Begier* to IRS's prepetition levy on the debtor's bank account. The levy did not establish that the particular fund in the debtor's bank account were IRS trust funds. "The transfer in this case was not voluntary, and therefore it simply does not fall within the purview of *Begier*.") (citing cases).

[22]   *See, e.g.*, *Taylor v. Adams (In re Nash Concrete Form Co.)*, 159 B.R. 611, 615 (D. Mass. 1993) (Massachusetts's withholding tax statute parallels IRC § 7501 by imposing trust on any sum or sums withheld. "Under *Begier*, [the Massachusetts statute] creates a trust in favor of the Commonwealth in the abstract total of taxes withheld from employees' wages. The resulting trust fund consists of 'a dollar figure not tied to any particular assets . . . rather than in the actual dollars withheld.'"); *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 102 (Bankr. D. Del. 2006) (Citing *Begier*, "employee contributions [to benefit plan] never became property of the estate but were always property of the employees held in trust by the Debtor. Payment of these

16

Under ERISA, "all assets of an employee benefit plan shall be held in trust by one or more trustees."  29 U.S.C. 1103(a).  Assets in an ERISA trust are "held for the exclusive purposes of providing benefits to the participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C. 1103(c)(1).  Not unlike the taxes in *Begier*, by regulation, ERISA "plan assets" include "*amounts* . . . that a participant or beneficiary pays to an employer, or *amounts* withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets."  29 C.F.R. § 2510.3-102(a) (emphasis added).[23]

---

contributions is not avoidable."); *Heilbronner v. Nicosia (In re Valerino Constr., Inc.)*, 250 B.R. 39 (Bankr. W.D.N.Y. 2000) (In action to avoid as preferential or as a fraudulent conveyance payment to debtor's sole shareholder's mother, "monies transferred . . . by the Debtor were trust funds under [New York State] . . . Lien Law and not property in which the Debtor had an interest for purposes of either Section 547 or Section 548; and . . . it makes no difference that [the transferees] were not proper trust beneficiaries, the funds were trust funds when transferred to them and, . . . , the funds continue to be trust funds. . . . Although it may seem unjust and inequitable for a Bankruptcy Court to allow a non-trust fund beneficiary to retain diverted Article 3-A trust funds and not allow the [bankruptcy] trustee to employ every possible avoidance power provided for by the Bankruptcy Code, including the ability to avoid preferential transfers, to recover the diverted trust funds, at least for the benefit of proper trust fund beneficiary creditors, the case law and language of Sections 547 and 548 are clear, and this Court does not believe that a trustee can use the avoiding powers under the Bankruptcy Code for this purpose.  As for equitable considerations, this favored class, trust fund beneficiary creditors, does not need either the avoiding powers provided for in the Bankruptcy Code or the bankruptcy system in order to fully protect it. . . . [T]here are adequate state law rights and remedies if these creditors are diligent and fully exercise those rights and remedies."); *In re College Bound*, 172 B.R. 399 (Bankr. S.D. Fla. 1994) (Employee contributions to 401(k) plan withheld from wages by employer/debtor were held in trust on petition date and were not property of the estate, "[t]his is true even if the monies were not segregated, provided that the monies were available in the Debtor's general funds.  The trust obligation does not extend to unpaid employer contributions.").

   23    *See Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 102 (Bankr. D. Del. 2006) ("[E]mployee wages which are withheld for the purpose of contributing to an employee benefit plan are assets of the plan held in trust for the employees from the moment they are withheld. . . . In contrast, employer contributions to an employee benefit plan are not held in trust until they are actually transferred to the employee benefit plan.") (citing *Chao v. Lexington Healthcare Group, Inc. (In re Lexington Healthcare Group, Inc.)*, 335 B.R. 570, 576-77 (Bankr. D.Del.2005) (imposing a

The funds transferred by Crosslin Plan and Greenpeace Plan to 1Point were employee contributions from payroll deductions, participant rollover contributions and employer matching contributions. All were ERISA plan assets imposed with a statutory trust. The trustee does not dispute this fact but claims that misappropriation of plan assets and commingling of plan assets by Stokes/1Point dissolved the statutory trust established by ERISA.

The contention that commingling destroys an ERISA trust has been uniformly rejected by courts when withholdings from employee wages are commingled by an employer before payment to the plan administrator. For example, in *In re College Bound, Inc.*, 172 B.R. 399 (Bankr. S.D. Fla. 1994), the retirement plan trustee sought turnover of monies withheld from employee wages as well

---

trust upon employee wages withheld for the benefit of an ERISA qualified 401(k) plan); *In re College Bound, Inc.*, 172 B.R. 399, 403 (Bankr. S.D. Fla.1994) ("Payment to the Plan is not the event that triggers transfer of property from the Debtor to the Plan. Instead, once the employees are paid and the employee contributions withheld, the withheld monies are deemed to be held in trust for the Plan[.]"); *United States v. Grizzle*, 933 F.2d 943, 946-47 (11th Cir.1991); *Prof'l Helicopter Pilots Ass'n v. Denison*, 804 F. Supp. 1447, 1453-54 (M.D. Ala.1992); *In re U.S. Lan Sys. Corp.*, 235 B.R. 847, 853-54 (Bankr. E.D. Va.1998); *Local Union 2134, United Mine Workers v. Powhatan Fuel, Inc.*, 828 F.2d 710, 714 (11th Cir.1987) (finding that the president's decision not to pay insurance premiums did not violate his fiduciary duty as the health plan trustee because "until monies were paid by the [president] to the plan there were no assets in the plan under the provisions of ERISA.")."); *Rahm v. Halpin (In re Haplin)*, Nos. 07-3206-bk & 07-3234-bk, 2009 WL 1272632, at *2 (2d Cir. May 11, 2009) ( "In the absence of a formal rule or regulation, the Department has informally advised that 'the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.' Assets will 'include any property, tangible or intangible, in which the plan has a beneficial ownership interest,' considering 'any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved.' Applying this reasoning, the Department has taken the position through various informal agency pronouncements that 'employer contributions become an asset of the plan only when the contribution has been made.' 'However, when an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan.'") (quoting respectively U.S. Dep't of Labor, Advisory Op. No. 93-14A (May 5, 1993); Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Field Assistance Bulletin 2008-1*, at 1-2 (Feb. 1, 2008); U.S. Dep't of Labor, Advisory Op. No.2005-08A (May 11, 2005); Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Field Assistance Bulletin 2008-1*, at 2 (Feb. 1, 2008)).

18

as employer matching contributions. The withheld funds remained in the possession of the debtor at the petition but were not segregated from the debtor's general funds. Rejecting the bankruptcy trustee's arguments that the commingled funds became estate property, the court observed: "Payment to the Plan is not the event that triggers transfer of property from the Debtor to the Plan. Instead, once the employees are paid and the employee contributions withheld, the withheld monies are deemed to be held in trust for the Plan, even if the funds remain in the Debtor's general checking account." *College Bound*, 172 B.R. at 403 (citing *Professional Helicopter Pilots Ass'n v. Denison*, 804 F. Supp 1447 (M.D. Ala. 1992)). *See also Bannistor v. Ullman*, 287 F.3d 394, 402 (5th Cir. 2002) (ERISA plan assets "include employee contributions to benefit plans which are withheld from employees' paychecks and for deposit into their benefit plans, even though the contributions have not actually been delivered to the benefit plan"); *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991) (employee contributions are plan assets even if they have not been delivered to the plan); *Navarre v. Luna (In re Luna)*, 406 F.3d 1192, 1199 (10th Cir. 2005) (unremitted contributions are plan assets under ERISA because "[p]ursuant to ordinary notions of property rights, the plan holds a future interest in the collection of contractually-owed contributions.").

The Defendants would rest here upon the finding that the Plans' assets were held in trust. They contend that *Begier*'s "nexus" analysis arose only because the trust fund taxes were commingled with the debtor's general funds and therefore some manner of identifying the trust funds was necessary. The question asked by the Supreme Court in *Begier* was "whether the particular dollars that [debtor] paid to the IRS from its general operating accounts were 'property of the debtor.'" This question had to be asked because the trust funds in *Begier* were commingled with the debtor's own funds. Here, there is no suggestion that ERISA plan assets were commingled with

19

property belonging to 1Point.  However, 1Point administered not only ERISA qualified plans but also Cafeteria Plans not necessarily covered by ERISA or by any statutory trust that has been acknowledged.  Because of this alleged commingling of trust assets with nontrust assets, the rest of *Begier* analysis applies.

As with the tax trust fund statute in *Begier*, ERISA's imposition of a trust speaks not to a particular *res* or defined property, but simply to "all assets of an employee benefit plan."  It is abstract "amounts . . . that a participant pays" or "amounts withheld."  "All assets" will rise and fall with wages earned or not earned, transfers made, participation withdrawn, profits earned.[24]

---

[24]

    ERISA does not exhaustively define the term "plan assets," although the regulations define the term to include amounts that participants pay to an employer or have withheld from their wages for contribution to a plan. 29 C.F.R. § 2510.3-102(a). The Secretary of Labor has repeatedly defined "plan assets" consistently with ordinary notions of "property rights," including in the definition any funds in which a plan has obtained a "beneficial interest." *See, e.g.*, 2005-08A Op. Dep't of Labor at *6-7 (May 11, 2005); 2003-05A Op. Dep't of Labor at *5 (April 10, 2003); 2001-02A Op. Dep't of Labor at *5 n. 2 (Feb. 15, 2001); 94-31A Op. Dep't of Labor at *3-4, 7 (Sept. 9, 1994); 93-14A Op. Dep't of Labor at *10-11 (May 5, 1993); 92-22A Op. Dep't of Labor at *8-10 (Oct. 27, 1992). Whether a plan has acquired a beneficial interest in particular funds depends on "whether the plan sponsor expresses an intent to grant such a beneficial interest or has acted or made representations sufficient to lead participants and beneficiaries of the plan to reasonably believe that such funds separately secure the promised benefits or are otherwise plan assets."  94-31A Op. Dep't. of Labor at *7 (Sept. 9, 1994).

*Kaida v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007) ("find[ing] the Secretary's reasoning in its rulings regarding 'plan assets' thorough, valid, and particularly consistent.").  *See also Navarre v. Luna (In re Luna)*, 406 F.3d 1192, 1199-1200 (10th Cir. 2005) ("An 'asset' is defined as '**1.** An item that is owned and has value. **2.** The entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill. **3.** All the property of a person available for paying debts.' Black's Law Dictionary 112 (7th ed.1999). Central to the definition of 'asset,' then, is that the person or entity holding the asset has an ownership interest in a given thing, whether tangible or intangible. In determining ownership interests, the obvious starting point is the common law of property.").

This distinction from a common law trust, led the Supreme Court in *Begier* to find that "[c]ommon-law tracing rules, designed for a system in which particular property is identified as the trust res, are thus unhelpful in this special context." *Begier*, 496 U.S. at 63.

"ERISA abounds with the language and terminology of trust law." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 100 S. Ct. 948, 103 L. Ed. 2d 80 (1989). "ERISA legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'" *Id.* at 111 (citations omitted). But, the Supreme Court has stated clearly that the common law of trusts "will inform, but will not necessarily determine the outcome of an effort to interpret ERISA's fiduciary duties." *Varity Corp. v. Howe,* 516 U.S. at 497. Rather, the courts are "to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Firestone*, 489 U.S. at 111. *Varity Corp.* explained:

> [T]rust law does not tell the entire story. After all, ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection. *See* ERISA § 2(a). *See also* H.R. Rep. No. 93-533, *supra,* at 3-5, 11-13, 2 Leg. Hist. 2350-2352; 2358-2360; H.R. Conf. Rep. No. 93-1280, pp. 295, 302 (1974), 3 Leg. Hist. 4562, 4569. And, even with respect to the trust-like fiduciary standards ERISA imposes, Congress "expect[ed] that the courts will interpret th[e] prudent man rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefit plans," *id.,* at 302, 3 Leg. Hist. 4569, as they "develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110-111, 109 S. Ct. 948, 954, 103 L. Ed.2d 80 (1989)

---

The Crosslin and Greenpeace Plans are defined contribution plans. "[T]he term 'defined contribution plan' means a plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 26 U.S.A. § 414(i). There can be no doubt that earnings on contributions also become plan assets entitled to the benefits and protections of ERISA.

21

Case 3:08-ap-00366    Doc 37    Filed 06/15/09    Entered 06/15/09 17:43:02    Desc Main
Document      Page 21 of 32

(quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S. Ct. 1549, 1557-1558, 95 L. Ed. 2d 39 (1987)).

>Consequently, we believe that the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties. In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements. And, in doing so, courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place.

*Varity Corp.*, 516 U.S. at 497. *See also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).

*Begier* recognized a departure from common law trust principles in the context of statutory trust fund taxes. Here, ERISA requires a similar departure. Commingling of trust funds and non-trust funds by 1Point did not destroy the trust erected by ERISA because the "nexus" requirement in *Begier* is satisfied. In *Begier,* the nexus was established when the employer paid its trust fund tax obligations to the IRS before the bankruptcy petition. Similarly, before these petitions, 1Point voluntarily transferred to the accounts of new administrators the Plans' assets recorded on 1Point's quarterly statements. There is no requirement under *Begier* or ERISA that the funds with which the plans were satisfied were the same funds deposited by the Plans during their relationships with 1Point.

That Crosslin and Greenpeace Plans cannot prove an entitlement to profits and earnings that did not exist will be a problem for Crosslin and Greenpeace Plans in other litigation, but not here. 1Point paid Crosslin and Greenpeace Plans amounts to which the Plans were not entitled because 1Point lied about investments, earnings and profits. This is undisputed. So, what is the remedy

22

when funds impressed with an ERISA trust are used to pay a contributing plan money to which it

is not entitled? Fraudulent conveyance law does not work well in this context because money held

in a statutory trust like ERISA cannot be recovered as a fraudulent conveyance under *Begier*. But

this is a problem specific to the remedy here sought by the trustee.[25]

---

[25] That the Defendant Plans will exit these adversary proceedings with their original funds in addition to "earnings" that were never earned screams for a remedy. Nothing here decided should be misconstrued to preclude the trustee from pursuing other avenues that may be available to these estates. For example, under ERISA:

> A civil action may be brought—(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) *to obtain other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3) (emphasis added). The Supreme Court has interpreted "appropriate equitable relief" to include "restitution of 'ill-gotten plan assets or profits.'" *Greenwood Mills, Inc. v. Burris*, 130 F. Supp. 2d 949, 962 (M.D. Tenn. 2001) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993) (citing *Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413, 1422 (11th Cir. 1998) ( "Even though disgorgement of profits may produce money, *Mertens* makes it clear that disgorgement of profits is a distinctly equitable remedy different from the legal remedy of compensatory damages for breach of fiduciary duty."))). "As an equitable remedy, 'restitution generally is awarded to prevent unjust enrichment to the defendant.'" *Id.* (citing *Schwartz v. Gregori*, 45 F.3d 1017, 1022 (6th Cir.1995) (citing RESTATEMENT OF RESTITUTION § 1 cmt. e (1937)); *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir. 1999) (noting that the "classic case of restitution" is "disgorging the profits from the ill-gotten wrongdoer"); Karl L. Stoecker, "ERISA Remedies After *Varity Corp. v. Howe*," 9 DEPAUL BUS. L.J. 237, 249 (1997).). "'The purpose of disgorgement is to force a 'defendant to give up the amount by which he was unjustly enriched' rather than to compensate' the plaintiff for his losses resulting from the defendant's acts." *Id.* at 963 (citing *SEC v. Johnston*, 143 F.3d 260, 263 (6th Cir. 1998)). *See also Great-West Life & Annuity Ins. Co., Inc. v. Knudson*, 534 U.S. 204, 214, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) ("[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."); *Maranda v. Group Health Plan, Inc.*, No. 07-4655 DSD/SRN, 2008 WL 2139584, at 3 (D. Minn. May 20, 2008) ("The right of recovery for unjust enrichment is equitable."). This is not to say the trustee will necessarily prevail under ERISA, nor is it intended to suggest that this is the trustee's only option for alternative relief. It is just to make the point that the failure of the trustee's remedy in these adversary proceedings is hardly the end of the issues these parties and others similarly situated must address to unravel the mess made by Barry Stokes.

23

Other courts have reached similar conclusions. The court in *College Bound* rejected a bankruptcy trustee's argument that withheld employee contributions had to be traceable to create a trust enforceable in bankruptcy. "Since the funds are deemed to be assets of the Plan under the express statutory trust, the tracing requirement does not apply. As long as the debtor had funds in excess of the employee withholdings, the amounts withheld from employee wages are deemed trust funds." *College Bound*, 172 B.R. at 403 (citing *In re California Trade Technical Schools, Inc.*, 923 F.2d 641 (9th Cir. 1991); *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366 (3d Cir. 1992)). While not citing *Begier*, the *College Bound* court's reasoning is consistent with *Begier*. The "nexus" in *College Bound* was the availability of funds to pay the amounts withheld.

In *1st Source Bank. v. Bradley (In re GS Consulting, Inc.)*, No. 3:07-CV-544-TS, 2009 WL 301917 (N.D. Ind. Feb. 5 2009), the Bank sought postpetition to set off against funds held in the debtor's medical claims account and general operating account. The debtor was a third-party administrator of healthcare claims for health insurance plans. Funds collected from some of the health insurance plans were governed by ERISA. After concluding that the debtor was an ERISA fiduciary with respect to the funds, the court held that monies accidently deposited with debtor after the relationship was terminated retained their status as trust funds. Commingling and misappropriation by the debtor did not defeat trust status. The district court explained:

> Consideration of ERISA and [its] purpose suggests that the inadvertently sent . . . funds should continue to be considered trust funds. This resolution is consistent with the statute's statement of findings and policy, including the policy 'to increase the likelihood that participants and beneficiaries under single-employer defined benefit pension plans will receive their full benefits.

*In re GS Consulting, Inc.*, 2009 WL 301917, at *6.

24

In *Chao v. Lexington Healthcare Group, Inc. (In re Lexington Healthcare Group, Inc.)*, 335 B.R. 570 (Bankr. D. Del. 2005), the Secretary of Labor sought turnover of ERISA pension plan contributions that were withheld from employee wages by debtor. Postpetition, the debtor's accounting manager set up an escrow account and deposited amounts previously withheld from wages but not remitted to the plan. The escrow was to be used only for the payment of employee benefits. While rejecting the Secretary's position that a trust was imposed on all of the debtor's assets for the unremitted withholdings, the court agreed that a trust arose: "A trust is necessary . . . when the employer withholds the contributions but fails to remit them to the plan." *Id.* at 576 (citations omitted). The trust however "is imposed only on the contributions that were withheld from the employees' wages. . . . [But consistent with *Begier*,] Plaintiff must show some nexus between the withheld funds and the funds on which it seeks to impose a trust." *Id.* at 577. There is "no requirement that the funds placed in escrow [i.e., identified to the trust] be the actual funds withheld from the employees." *Id.* at 578. The escrow established a sufficient nexus between the funds placed in the escrow and the funds withheld from the employees. *Id.*

Each of these cases, consistent with *Begier*, concludes that voluntary payment or the availability of funds establishes a sufficient connection between the ERISA trust and the assets applied to a debtor's trust fund obligations.

A search for contrary authority has turned up only one line of cases that supports the trustee's position by distinguishing *Begier* on a basis not available to the trustee. These cases arose in the (non-ERISA) context of payroll service providers that contracted with clients to pay state and federal employment taxes and ended up in bankruptcy after paying the obligations of some clients but not others. In each of these cases, preference actions were brought against the clients—*not* the taxing

25

authorities—to recover funds paid during the preference period on behalf of the client. *See Wyle v. S&S Credit Co. (In re Hamilton Taft & Co.)*, 53 F.3d 285 (9th Cir.), *vacated as moot after settlement*, 68 F.3d 337 (9th Cir. 1995); *Bauman v. Emerald Elec., Inc. (In re Pay+Plus Payroll Admins.)*, 389 B.R. 796 (Bankr. M.D. Fla. 2008); *Morin v. Ceres Corp. (In re Aapex Sys., Inc.)*, 273 B.R. 35 (Bankr. W.D.N.Y. 2002); *Morin v. Elmira Water Bd. (In re Apex Sys., Inc.)*, 273 B.R. 19 (Bankr. W.D.N.Y. 1999).

*Hamilton Taft* is typical of these cases. In *Hamilton Taft,* the Ninth Circuit sustained a trustee's preference action, finding that client funds transferred to the debtor did not retain their status as trust funds in the hands of the debtor. In *Hamilton Taft,* the debtor contracted with clients to pay state, federal and local payroll taxes and to prepare reports. Clients would pay taxes to the debtor in advance of those taxes being due to the taxing authorities. Client funds were not segregated by the debtor but were commingled with the funds of other clients and were used by the debtor for its own purposes until it was time to pay a client's taxes. Improper handling of commingled funds and bad investments resulted in a huge cash shortfall. Just prior to an involuntary bankruptcy filing, the debtor made payments on behalf of one client, S&S, totaling $7,632,269. At the petition, S&S had minimal unpaid taxes remaining; the debtor's other clients collectively had $90 million in unpaid taxes.

Opposing the trustee's preference action, S&S argued that the funds it transferred to the debtor were held in statutory trust under IRC § 7501 and therefore were not property of the debtor for purposes of § 547(b). The bankruptcy and district courts agreed and dismissed the trustee's complaint. The Ninth Circuit disagreed. While the funds were undoubtedly impressed with the statutory trust when they were withheld from employees by S&S, transfer of the funds to a third party

26

under contract that did not provide that the transferred funds would be held in trust by the third party freed the funds of their trust. The Ninth Circuit arrived at this conclusion by applying the common law of trusts. *Begier* was distinguished because the *Hamilton Taft* case did not "involve a debtor 'voluntarily paying *its* trust-fund tax obligation.'" *Id*. at 289. As explained by the Ninth Circuit:

> The exception to the common law treatment of trusts elaborated in *Begier*, was justified by the language and purpose of § 7501. However, these factors do not require the exception to the common law that S&S is seeking in this case. The statutory language clearly indicates that the statutory trust is created for the benefit of the IRS, not the taxpayer. We should not, therefore, easily impute to Congress an intention to alter the common law of trusts when doing so would not materially further the interests of the beneficiary of the statute.
>
> Nor should we extend the holding in *Begier* more broadly than is necessary to accomplish its purposes when doing so necessarily undermines the Bankruptcy Code's core principle of equality of distribution among creditors. In *Begier*, the Court found an exception to the common law of trusts was necessary to effectuate the congressional intent that the IRS not be deprived of funds that had been specifically withheld from employees' pay for the express purpose of payment to the IRS. Had the trust-fund taxes been considered property of the debtor in *Begier*, the IRS would have been compelled to receive partial payment of the taxes due like all the other creditors. However, when the bankrupt debtor is a third party and the employer remains solvent, the concerns of *Begier* dissolve. The ability of the IRS to collect the taxes owed by [Hamilton & Taft's] clients is simply not implicated in this case.

*Id*. at 290.

The preference defendant in *Begier*—the IRS—was the beneficiary of the statutory trust and this legislative intent inspired the Supreme Court to reject ordinary trust principles. The defendant in *Hamilton Taft* was the employer on whose behalf money was paid to the government. The statutory trust the employer asserted in *Hamilton Taft*—IRC § 7501—was intended to benefit the government, not the defendant employer. The Ninth Circuit reverted to common law trust principles in *Hamilton Taft* because the statutory trust asserted by the employer was not created for the employer's benefit.

27

Here, the Defendant Plans are precisely the intended beneficiaries of the ERISA-created trust they assert in defense of the trustee's fraudulent conveyance action. Reverting to common law trust principles to undo the statutory trusts with respect to funds paid to 1Point/Stokes would be inconsistent with *Begier* in a context that is importantly different from *Hamilton Taft.*

*Begier* looked to the Bankruptcy Code for "any suggestion" that a different tracing rule should apply—other than actual prepetition payment. The Supreme Court found none in *Begier* with respect to tax withholding and excise taxes.

Here, if anything, the Bankruptcy Code supports the conclusion that prepetition payment of ERISA trust funds is a sufficient "nexus" for *Begier* purposes. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 [26] added a new § 541(b)(7) which provides that property of the estate does not include:

(7) any amount–
    (A) withheld by an employer from the wages of employees for payment as contributions–
        (i) to–
            (I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;
            (II) a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or
            (III) a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;
        except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2); or
        (ii) to a health insurance plan regulated by State law whether or not subject to such title; or
    (B) received by an employer from employees for payment as contributions–
        (i) to-

---

[26]   Pub. L. No. 109-8, 119 Stat. 23 (2005).

28

> (I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;
> (II) a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or
> (III) a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;
> except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2); or
> (ii) to a health insurance plan regulated by State law whether or not subject to such title[.]

11 U.S.C. § 541(b)(7).

While there is scant legislative history accompanying this provision, its plain language broadcasts Congressional intent to protect employee pension and benefit contributions from general claims in bankruptcy cases. The amendment seems to codify decisions, like *College Bound*, holding that employee contributions withheld by an employer were plan assets held in trust and not property of the debtor even though they had not been turned over to a plan and had been commingled. New § 541(b)(7) is consistent with the view that the availability of funds or actual payment to satisfy withholdings and contributions would create the nexus required by *Begier*.

In this case, the broad language of § 541(b)(7)—*any amounts*—removes from property of the 1Point estate any amounts withheld from an employee's pay or collected as a contribution to a benefit plan described in that new section.[27]

Under *Begier* as informed by ERISA and § 541(b)(7), the voluntary transfers made by 1Point to the Greenpeace and Crosslin Plans were not of property of the debtor for purposes of § 548(a) and are therefore not avoidable as fraudulent conveyances.

---

[27] Not to gild the Lilly, because all such amounts were already in possession of the Plans, they were impressed with an ERISA trust before transfer to 1Point.

29

***III. State Law Fraudulent Conveyance Action Under TENN. CODE ANN. § 66-3-305(a)(1).***

In addition to the fraudulent conveyance action in § 548(a) of the Bankruptcy Code, the Plaintiff—in his capacity as both an ERISA fiduciary[28] and Chapter 11 trustee—asserts a state law fraudulent conveyance claim under TENN. CODE ANN. § 66-3-305(a)(1). Section 66-3-305(a) provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> > (1) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

TENN. CODE ANN. § 66-3-305(a)(1).

Plaintiff asserts that unlike § 548(a) of the Bankruptcy Code, the state law cause of action has no predicate that the challenged transfer be an interest of the debtor in property. Not questioning this conclusion, Defendants challenge Plaintiff's state law cause of action as preempted by ERISA, 29 U.S.C. §§ 1144(a), 1132(a)(2) and (3).

On its face, TENN. CODE ANN. § 66-3-305(a)(1) does not include the magic words of § 548(a)—"interest of the debtor in property."[29] However, there is a trail in state law that leads to the same result.

---

[28]  In *McLemore v. Regions Bank*, No. 3:08-cv-0021 (M.D. Tenn. 2008) (Memorandum on defendants' motions to dismiss, at 10-15), the District Court concluded that the Chapter 11 trustee was *also* a fiduciary under ERISA.

[29]  To the extent Plaintiff brings this action as Chapter 11 trustee via the strong arm powers in 11 U.S.C. § 544, the Bankruptcy Code supplies the limitation that only a transfer of property of the debtor can be recovered. *See* 11 U.S.C. § 544(a) ("The trustee . . . may avoid any transfer of property of the debtor. . . .").

30

Section 66-3-305(a) refers to a "transfer."  Section 66-3-302(12) defines "transfer" to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an *interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrances[.]"  TENN. CODE ANN. §  66-3-302(12) (emphasis added). "Asset" in turn is defined as "*property of a debtor,* but the term does not include: (A) Property to the extent it is encumbered by a valid lien; (B) Property toe the extent it is generally exempt under nonbankruptcy law; or  (C) An interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one (1) tenant[.]"  TENN. CODE ANN. § 66-3-302(2) (emphasis added).  Finally, "property" is defined as "anything that may be subject of ownership".  TENN. CODE ANN. § 66-3-302(10).

Reading these subsections together, for a transfer to be avoidable under § 66-3-305(a), it must have been of  property of the debtor, or of an interest of the debtor in property.[30]  The Uniform Fraudulent Transfer Act (UFTA), as substantially adopted in Tennessee, is aimed at protecting unsecured creditors when a debtor manipulates property to defeat creditor interests.  UNIFORM FRAUDULENT TRANSFER ACT § 1 cmt. 2 (1984) ("it is . . . appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of 'asset' for the purposes of this

---

[30]     *See, e.g.*, *San Remo Funding Group v. Mako Fund, Inc*., No. B186346, 2007 WL 1748609, at *2 (Cal. App. 2d Dist. June 19, 2007) ("This is not . . . a situation for which the UFTA provides a remedy. The UFTA concerns transfers by debtors of their own property, in derogation of creditors. Under the UFTA, a transfer means 'every mode . . . of disposing of or parting with an asset . . .' and an  ''Asset' means property of a debtor . . .' But the property that was transferred here was not Mako's; it was the venture's.  Mako 'transferred' it expressly on behalf of the venture. Although Mako may have caused or effected a transfer of the venture's properties, in such a manner as to give rise to a tort claim, Mako did not transfer property of its own, such as could be reached to satisfy plaintiff's claim against it.  Plaintiff's attempt to invoke the UFTA to restore the venture's property therefore fails.") (internal citations omitted).

31

Act."). Requiring that the debtor have an interest in the property transferred is fundamental to achieve this purpose. As explained above, 1Point did not have an interest in the funds transferred to the Defendant Plans. Plaintiff's action under TENN. CODE ANN. § 66-3-305(a) fails.[31]


## CONCLUSION

Crosslin Plan and Greenpeace Plan were among the fortunate few who terminated their relationships with 1Point before Stokes's Ponzi scheme completely collapsed. While their good fortune may result in inequity among similarly situated parties in these bankruptcy cases, this is the result required under *Begier* with respect to the bankruptcy trustee's fraudulent conveyance actions. For the reasons detailed above, Defendants' motions for summary judgment are granted. An appropriate order will be entered.

---

[31] Defendants' invitation to unravel the preemption issue is left for another day.

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.